FILED

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
#### OCALA DIVISION

2017 APR 11  PM 2:28

UNITED STATES OF AMERICA, *ex rel.*,
[UNDER SEAL]

     Plaintiffs,

v.

[UNDER SEAL],

     Defendants.

                          /

CASE NO.: 5:17-Cv-152-Oc-34PRL

***FILED IN CAMERA AND
UNDER SEAL***

***DO NOT ENTER IN PACER***

## COMPLAINT

S-1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA, *ex rel.*,
MICHAEL    PENNACHIO,    M.D.;    and
SHARON DRAKE,

      Plaintiffs/Relators,

v.

CRAIG D. FISHMAN, M.D.; and JEFFREY A.
SHERIDAN, M.D.,

      Defendants.

_____/

CASE NO.: 5:17-cv-152-Oc-34 PRL

*FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730(b)(2)*

*DO NOT ENTER IN PACER*

## QUI TAM COMPLAINT
## (JURY TRIAL DEMANDED)

      Plaintiffs/Relators, MICHAEL PENNACHIO, M.D., and SHARON DRAKE, bring this Qui Tam action in the name of the United States of America, by and through the undersigned attorneys, Byrd Campbell, P.A., and allege:

## SUMMARY INTRODUCTION

      1.    This is an action by Qui Tam Plaintiffs/Relators, MICHAEL PENNACHIO, M.D. ("Dr. Pennachio"), and SHARON DRAKE ("Ms. Drake"),[1] on behalf of the United States of America (the "Government"), against Defendants, CRAIG D. FISHMAN, M.D. ("Dr. Fishman") and JEFFREY A. SHERIDAN, M.D. ("Dr. Sheridan"),[2] to recover penalties and damages pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, for Defendants' conduct in providing medical services to patients covered by Medicare that were unreasonable or unnecessary to their condition or treatment, solely to defraud the Government through improper Medicare reimbursements.

---

[1] Dr. Pennachio and Ms. Drake are hereinafter collectively referred to as "Plaintiffs/Relators."

[2] Dr. Fishman and Dr. Sheridan are hereinafter collectively referred to as "Defendants."

Defendants knowingly caused violations of 42 U.S.C. § 1395y(a)(1)(A), as proscribed by 31 U.S.C. §§ 3729, *et seq.,* together with related violations of 18 U.S.C. §§ 371, 372.

## PARTIES

2.      Dr. Pennachio is a citizen of Lake County, in the State of Florida.

3.      Ms. Drake is a citizen of Lake County, in the State of Florida.

4.      Dr. Fishman is a citizen of Seminole County, in the State of Florida.

5.      Dr. Sheridan is a citizen of Lake County, in the State of Florida.

6.      Drs. Pennachio, Fishman, and Sheridan are presently and at all times material to this action were the sole and equal shareholders of an ophthalmology practice,[3] a professional association registered in Florida as "Fishman & Sheridan, M.D., P.A.," and formerly registered and operating as "Pennachio & Fishman, M.D., P.A.," and at all times material to this action doing business under a tradename belonging to Dr. Pennachio, "Total Eye Care Center" (hereinafter referred to as "The Practice").

7.      Dr. Pennachio is an ophthalmologist and eye surgeon.  In 1985, Dr. Pennachio started practicing as a sole practicioner under "Dr. Michael Pennachio, M.D.," and later in 1991, Dr. Pennachio founded "Michael P. Pennachio, M.D. P.A.," as its sole shareholder.  Dr. Pennachio also registered and began doing business under the Total Eye Care Center fictitious name and tradename in 1991, which he has owned since its creation.

8.      On or about January 1, 1998, Dr. Fishman, also an ophthalmologist and eye surgeon, became a shareholder in The Practice, and its name was changed to "Pennachio & Fishman, M.D. P.A."

---

[3] Ophthalmology is the medical practice of screening for, diagnosing, evaluating, or treating conditions associated with the eye.

Qui Tam Complaint and Demand for Jury Trial

9.    Later, in 2006, Dr. Sheridan, also an ophthalmologist and eye surgeon, became a shareholder in The Practice.

10.    The Practice maintains its offices in Lake County, Florida, in the cities of Clermont, Eustis and Leesburg, Florida.

11.    The billing practices of Defendants, which are the subject of this proceeding, originated in Lake County, Florida, where Defendants performed the procedures which were the subject of fraudulent and/or improper billing, as hereinafter described.

12.    Dr. Pennachio remained a shareholder and employee of The Practice until he was effectively forced out of The Practice in February 2017, after he attempted to correct the pattern of mistreatment and misbilling that lead to the filing of this Complaint against Defendants. His stock in The Practice is subject to a mandatory buy-out by Defendants Fishman and Sheridan.

13.    Dr. Pennachio has direct, independent, and personal knowledge of the facts set forth herein, unless otherwise specified.

14.    Ms. Drake was the practice director of The Practice and worked there for about 24 years, before leaving her employment in February 2017.

15.    As the former practice director, Ms. Drake also has direct, independent and personal knowledge of the facts set forth herein, unless otherwise specified.

## JURISDICTION & VENUE

16.    This action arises under the False Claims Act of 31 U.S.C. §§ 3729, *et seq.*

17.    This Court maintains subject matter jurisdiction over this action under 31 U.S.C. § 3723(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

18.    Venue is proper in this Court under 31 U.S.C. § 3732(a) because at all times material to this action Defendants transacted business in this district and division; and, as set forth

below, Defendants knowingly caused violations of 42 U.S.C. § 1395y(a)(1)(A), as proscribed by 31 U.S.C. §§ 3729, *et seq.*—acts giving rise to this action and occurring within this district, as set forth more fully below.

19.     At the time of filing this action, Dr. Pennachio served a copy of same upon the Government, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

20.     Dr. Pennachio and Ms. Drake have complied with all conditions precedent to bringing this action, or they are otherwise excused by law.

21.     Dr. Pennachio and Ms. Drake are, from the different perspectives as founding shareholder and practice director, respectively, the original source of, and have direct and independent knowledge of, the information disclosed herein on which the allegations herein are based, and have voluntarily provided such information to the Government at the time of filing this action under seal.

## INTRODUCTION

22.     Medicare is a federally funded health insurance program primarily for the elderly, whereas Medicaid is a federally funded health program for certain low income individuals and families (Medicare and Medicaid are hereinafter collectively referred to as "Medicare").  If a physician or the physician's medical practice is certified by Medicare, the Government will provide a reimbursement for covered services provided to covered patients.

23.     Medicare "Part B" covers reimbursement for services and supplies that are medically necessary for the treatment of a patient's health condition.  Under 42 U.S.C. § 1395k, Medicare Part B covers services provided by licensed specialists, including ophthalmologists like Dr. Fishman.   However, under 42 U.S.C. 1395y(a)(1)(A), Medicare Part B only covers

ophthalmology services if they are *reasonable and necessary* for the diagnosis or treatment of an individual's condition.

24.    One of the two eye conditions for which Medicare pays the most each year is that of cataracts, which involves a clouding of the eye's lens and is the leading cause of blindness in the world.  Medicare covers several types of surgeries that treat cataracts by removing the cloudy, natural lens in an eye, and replacing it with a synthetic lens.  However, Medicare pays a higher rate for especially difficult cataract surgeries, which are called "complex" cataract surgeries.[4]

25.    For many years, Defendants provided unreasonable and/or unnecessary treatment and care to many of their ophthalmology patients, in order to generate higher billing claims to defraud the Government's Medicare program into reimbursing improper treatment.  In some cases, the unreasonable and unnecessary medical services Defendants provided needlessly subjected patients to injury or heightened risk of injury.

## THE PRACTICE

26.    In or around 1998, Dr. Pennachio invited Dr. Fishman to become a shareholder in his practice and to provide ophthalmology services to patients, and the two entered into a stockholder's agreement providing, *inter alia*, that each doctor owned fifty percent (50%) of The Practice.  In 2006, Drs. Pennachio and Fishman invited Dr. Jeffrey A. Sheridan, M.D., to join The Practice and executed a similar agreement agreeing to be bound by the earlier stock purchase agreement and providing, among other things, that each eye surgeon owned one-third (33.3%) of The Practice.

---

[4] In 2012, Medicare paid an average of approximately $900 for each complex cataract surgery and $700 for each regular cataract surgery—almost thirty percent (30%) more.

27.     The Practice structured its financial model and employment agreements such that Drs. Pennachio, Fishman, and Sheridan were paid on each individual surgeon's net professional collections. Thus, the more money any one doctor generated through billing patient services, the more that doctor alone would profit after paying for his share of The Practice's overhead expenses.

28.     For years, the three doctors operated The Practice successfully across three Central Florida office locations. However, in 2013, when the 2012 public Medicare billing charges were released, Dr. Pennachio and Ms. Drake began an internal review of the three doctors' use of Medicare billing codes (the means by which the doctors claimed reimbursements from the Government for services provided to patients covered by Medicare) as well as the doctors' "medical necessity documentation" (the records the doctors were required to maintain in order to support their use of billing codes).

29.     The Practice did not then have an outside reviewer, and Dr. Pennachio and Ms. Drake were concerned about The Practice's billing practices.  For instance, upon confrontation, in 2013, Dr. Fishman refused to change his use of retina photography, believing that it was a defendable practice, and despite that Dr. Sheridan agreed with Dr. Pennachio that these retina photography billings were not medically necessary.  However, in later discussions with Ms. Drake, Dr. Fishman promised to improve his chart and overbilling practices as the result of these concerns, although substantial changes never materialized, as set forth more fully below.

30.     In 2016, Dr. Pennachio and Ms. Drake repeated their internal review of the three physician's billing practices and at time requested an outside audit of The Practice's billing by a neutral and independent reviewer.

31.     Dr. Pennachio and Ms. Drake concluded in substance that The Practice may have been at risk for overutilization of certain billing codes and lack of medical necessity

documentation. They urgently requested Defendants to approve the hiring of a consultant to conduct an independent and professional audit to identify any existing problems and ensure The Practice was conducting its business correctly. This allegation is supported by the February 8, 2017, Affidavit of Ms. Drake, a true and correct copy of which is attached hereto within **Composite Exhibit "A."**

### CONFLICT ERUPTS WITHIN THE PRACTICE

32.     By this point in time, Dr. Pennachio had become concerned about Dr. Fishman's insufficient and improper standard of care when giving treatment, as well as his overutilization of tests and procedures to collect more from using more lucrative billing codes.

33.     For instance, Dr. Fishman was observed doing Toric intraocular lens procedures in a manner contrary to the standard of care or supported even by the operative notes he himself signed. Dr. Pennachio repeatedly requested Dr. Fishman to amend the operative notes to accurately reflect the treatment Dr. Fishman had provided, which he refused to do.

34.     Likewise, between at least 2013 and 2016, upon Dr. Pennachio voicing his concerns, Dr. Fishman promised Ms. Drake that he would correct various procedures he was overutilizing. However, despite that in some cases Dr. Fishman *reduced* his overutilization practices, in each such case Dr. Fishman's utilization rates remained far above normal and lacked proper documentation.

35.     Nonetheless, Dr. Fishman continuously refused to agree to any audit of The Practice, and he persuaded Dr. Sheridan to join him in overruling Dr. Pennachio's audit requests, forming a constructive alliance of the Defendants—who refused to risk exposing their improper treatment and billing methods in comparison with those of Dr. Pennachio, whose only concern was the welfare of The Practice and its patients.

36.    Defendants' alliance caused a snowball of strife and conflict between the three doctors and their staff, culminating in 2016, when Defendants began acting in concert to oust Dr. Pennachio from The Practice—in violation of express terms of their Shareholder Agreements and governing documents—primarily because Dr. Pennachio and Ms. Drake would not relent from their insistence that The Practice undergo an audit. (*See* Comp. Ex. A.)

## SPECIFIC CONDUCT OF DEFENDANTS

37.    Dr. Pennachio's concerns were not unfounded, as many of The Practice's employees have come forward to attest that Defendants provided unnecessary and/or unreasonable treatment to patients to accommodate overutilization of billing codes. For instance:

a.    Sharon Drake worked at The Practice for twenty-four (24) years before resigning in 2017 as its Director—overseeing The Practice's staff and financial and clinical activities.  On March 13, 2017, Ms. Drake provided an affidavit detailing the hostility, threats, and intimidation Dr. Fishman and Dr. Sheridan employed to curtail any voice at The Practice from standing up to their recurrent and deficient mistreatment of patients and overutilization of billing codes, writing *"[i]t truly made me sick to see how it turned from getting Dr. P out to let's crush him every way we can.  I no longer wanted any part of it."* Additionally, Ms. Drake cautioned Dr. Fishman about his use of complex cataract coding, especially in procedures employing "Vision Blue" since the use of Vision Blue (aka "Trypan Blue") ophthalmic solution[5] was only proper when a patient's cataracts were mature or hypermature, which was rarely the case for Dr. Fishman's patients.  Additionally, beginning in 2016, use of Vision Blue generally no longer qualified as a complex cataract

---

[5] Trypan Blue or Vision Blue is used as an aid in ophthalmic surgery by staining the anterior capsule of the lens, which reduces risk of complications in certain cataract surgeries.

surgery, yet Dr. Fishman continued to use Vision Blue to bill cataract surgeries as complex. Ultimately, Dr. Fishman refused to change his coding behavior and further threatened to oust Dr. Pennachio from The Practice if he and Ms. Drake would not cease with their warnings and requests to bring in an independent auditor. (*See* Comp. Ex. A at March 13 Affidavit.)

      b.      Ms. Drake also provided an affidavit on April 7, 2017, wherein she explained that in July 2016 she learned that Dr. Sheridan had been overbilling Medicare since 2009 by billing for both "blepharoplasty" and "ptosis" surgeries, coded as 15823 and 67904, respectively, when they were no longer permitted to be billed together. After confronting Dr. Sheridan about The Practice's responsibility to self-report and correct overpayments on this issue, that this overbilling could be in the "six-figures," and that The Practice could suffer even more penalties for failing to report the overbilling after discovering the problem, Dr. Sheridan directed Ms. Drake to take no further action because "[he] didn't feel this was considered identification of a problem." (*See* Comp. Ex. A at April 7 Affidavit.)

      c.      Ms. Drake also shared internal data from The Practice's records evidencing that both Defendants billed "ptosis" and "blepharoplasty" surgeries in almost equal numbers in 2012–2014, numbers which were neither normal nor representative of the frequency of the diseases involved, since, generally, the more typical ratio is a much lesser number of ptosis to blepharoplasty surgeries.

      d.      Vicki Tracy is a certified ophthalmic technician with forty-one (41) years of experience who worked with The Practice for over seventeen (17) years, until March 2017. On March 13, 2017, Ms. Tracy provided an affidavit stating that Dr. Fishman would

order unnecessary optic nerve photos beyond normal protocol, and would even reject the results of a patient's glare test and use his own "penlight" method in order to obtain a different measurement.  Additionally, Ms. Tracy observed Defendants regularly examine their patients before dilation eyedrops had had enough time to become effective for an accurate eye exam, and also observed Dr. Sheridan knowingly permit unqualified staff to perform important tests on patients, critical to surgery-related decisions.  A true and correct copy of Ms. Tracy's Affidavit is attached hereto as **Exhibit "B."**

e.     Christopher Brown is a certified ophthalmic technologist with thirty (30) years of experience who worked with The Practice for over twenty (20) years, until 2017.  Mr. Brown witnessed Dr. Fishman reprimanding support staff for recording the results of cataract glare testing, only because the results of the test being recorded would not allow Dr. Fishman to schedule cataract surgery.

f.     Elizabeth DeJesus is a certified ophthalmic technician with five (5) years of experience at The Practice under all three doctors.  On February 10, 2017, Ms. DeJesus provided an affidavit stating that in or about 2014, Dr. Fishman reprimanded her for writing the result of a patient's "glare test" exams, because if she wrote "the results of the glare test[,] then he wouldn't be able to perform the surgery on the patient."  A true and correct copy of Ms. DeJesus' Affidavit is attached hereto as **Exhibit "C."**

38.     The Practice's internal records corroborate the observations of support staff, as Dr. Fishman's overutilization of complex cataract surgery is also evident from The Practice's internal Utilization Analysis records, which demonstrate Dr. Fishman's high level of complex cataract surgeries.  A true and correct copy of The Practice's internal, 2014 and 2015 Utilization Analysis records attached hereto as **Exhibit "D."**

## DR. PENNACHIO'S EFFORTS TO
## CORRECT DEFENDANTS' IMPROPER ACTIVITIES

39.     Not only did The Practice's staff observe and report that Defendants provided patients improper medical services inconsistent with proper standards of care to accommodate overutilization of billing codes, but Dr. Pennachio's observations and inquiries led him to identify that a much higher than normal ratio of the cataract surgeries performed by Dr. Fishman were coded as "complex," and that all of the complex-coded cases involved the use of Vision Blue even though very few of those cases involved mature or hypermature cataracts. *See* a true and correct copy of the Complex Cataract Coding summary of information The Practice received from its complex cataract coding consultants in or around August 2016, attached hereto as **Exhibit "E."** Dr. Pennachio's resulting concerns led him to request, through counsel, on May 24, 2016, that Defendants agree to an independent audit of the billing practices of all three doctors by an independent audit firm.  A true and correct copy of that letter is attached hereto as **Exhibit "F."**

40.     Defendants rejected the proposal, and only escalated their efforts to force Dr. Pennachio to resign from The Practice or to retire.

41.     Dr. Pennachio also sent Dr. Fishman his own letter on June 16, 2016, wherein he expressly identified the manner in which Dr. Fishman's surgical methods were below normal standards of care:

> *I have been told you now rarely mark the axis in the OR despite signing the OP note that states you did.  I believe the standard of care is to mark the axis in the OR by many different means but it is not the standard to not mark . . . . I am also asking you to identify all patients you did not mark and amend the OP notes appropriately. . . . You will be required to mark all patients axis in the OR and no longer state you marked when you did not.*

A true and correct copy of Dr. Pennachio's letter is attached hereto as **Exhibit "G."** When Ms. Drake attempted to personally deliver the letter to Dr. Fishman, he refused to take possession of the letter and instead forced Ms. Drake read the message to him aloud.

42.     Notwithstanding Dr. Fishman refused to take possession of the June 16 letter, Dr. Pennachio also referenced his concerns about Dr. Fishman's deficient standard of patient care in a June 20, 2016, email to Defendants:

> *You have a higher rate of known complications . . . than your partners but refuse to use pupil expanding devices. You also have a higher rate of post op corneal edema but have refused to alter your technique. I recently reviewed your post op refractive errors in your Toric cases and your results are not within the standards one would expect. The problem is there is no documentation of discussions with the affected patients about correcting the problem and you are not practicing the standard of care in marking during surgery . . . . You also despite no known publications or lectures advocating your technique for vision blue[,] you do not place vision blue under air or viscoelastic. . . .*

A true and correct copy of the email from Dr. Pennachio is attached hereto as **Exhibit "H."**

43.     In the same email, Dr. Pennachio revealed his personal concern over Dr. Fishman's improper billing practices:

> *One of the reasons I was going to retire was that I was increasing[ly] frustrated with my attempts to modify your billing and surgical problems. . . . [The Practice's consultant] went on to say you are an outlier in fundus photos, YAG laser capsulotomy, gonioscopy and complex cataracts. . . . If you are confident a Medicare audit would be clean why not have a private[] review first to confirm that.*

(Ex. H.)

44.     Finally, the email also set forth how Dr. Fishman had continued to refuse to allow The Practice to undergo a private review or audit of records dating back to 2012:

> *[D]espite your insistence that your billing is clean you refuse to amend our agreement to hold your partners harmless if your billing results in sanctions. If you think your billing is all medically necessary why would you consider a private review back to 2012 punitive even though I offered to pay the entire amount of the review. . . . why object to obtaining the data to exonerate yourself.*

(Ex. H.)

45.     Coincidentally, four days after Dr. Pennachio sent this email to Defendants, United Healthcare, one of the nation's largest private healthcare insurers, sent Dr. Fishman a letter to warn him of his overutilization of complex cataract surgery codes, which stated, in pertinent part:

> *During a recent review of claim submissions, we identified the following trend in your practice as compared to other practitioners billing the same codes: High use of complex cataract surgery codes*
>
> *Cases coded as complex cataract . . . must have indications for using that code dictated within the body of the operative note as well as in the physician's office notes.* **Please ensure that [the complex cataract] code is being used only in instances requiring devices or techniques not generally used in routine cataract surgery.** (emphasis added)

A true and correct copy of the United Healthcare letter dated June 24, 2016 is attached hereto as **Exhibit "I."**

46.     Additionally, Dr. Pennachio discovered data disclosing that the services Dr. Fishman provided to Medicare patients (published by the Government), revealing that Dr. Fishman's billing of various ophthalmic medical treatments, including complex cataract surgery, had been suspiciously high as compared to national averages. For instance, in 2012, Dr. Fishman charged forty-nine percent (49%) of his cataract surgeries as "complex"; in 2013, he charged thirty-three (33.5%) of his cataract surgeries as "complex"; and in 2014, he charged twenty-one (20.8%) of his cataract surgeries as "complex."

47.     On February 23, 2017, Dr. Pennachio renewed his request for an audit of The Practice's billing practices, through a letter sent by his counsel, again proposing that Defendants

consent to an audit of the following procedures: retinal photography, gonioscopy, the ratio of complex cataract surgery to standard cataract surgery, the ratio of YAG laser capsulotomy versus cataract surgery, and any billing data and charts necessary for an independent auditor to reach an independent judgment about the procedures. Once again, this request was rejected.  A true and correct copy of the letter is attached hereto as **Exhibit "J."**

48.     Upon information and belief, Defendants' rejection of the audit was solely to thwart an independent review of the billing records and charts of The Practice so as to minimize their financial exposure to the Government and other payors.

49.     With no further recourse to resolve his fear that Defendants were engaging in conduct that put himself and The Practice at risk, with no other means by which to obtain an audit of The Practice's billing records and charts through an independent auditor, and to redress Defendants' misconduct in violation of their Shareholders Agreement, Dr. Pennachio filed a civil suit against Defendants in the Fifth Judicial Circuit in and for Lake County, Florida, Case Number 2017-CA-000505, styed *Pennachio v. Fishman, et al.*, which action is presently pending.

50.     As of this date, all underlying data necessary for making more particularized allegations about the fraudulent billing practices of Dr. Fishman remain in the hands of Defendants and The Practice.

51.     Ultimately, in conducting independent research of internal records and support staff testimony, as well as through the report of a private consultant, Dr. Pennachio has confirmed that Dr. Fishman provided deficient care while engaging in these improper billing activities for at least seven (7) years.

52.     At the expense of defrauding the Government's Medicare program, Defendants provided patients with improper ophthalmology services to increase the revenues and compensation they generated.

53.     Defendants engaged in these practices despite their specific knowledge that Dr. Pennachio, the more experienced physician and founder of The Practice, objected to and protested their conduct.  In nearly all such cases, the procedures were not dictated by the applicable standard of care and were not properly documented in the medical charts of The Practice, and they were performed only to increase Defendants' net professional revenue.

<u>COUNT I</u>
**Violations of the False Claims Act—Dr. Fishman**

54.     This Count I is a claim for relief for Dr. Fishman's violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

55.     Plaintiffs/Relators incorporate and reallege the allegations of Paragraphs 1–53.

56.     As described in this Qui Tam Complaint, Dr. Fishman: (i) knowingly presented, or caused to be presented, to the Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

57.     The false claims were made or caused to be made by Dr. Fishman, the processing and administration of which was unintentionally carried out by The Practice and under its Medicare number.

58.     Dr. Fishman personally supervised the false billing and caused The Practice to submit it to the Government.

59.     Dr. Fishman did so for his own financial benefit, pursuant to an employment agreement under which he personally benefitted from the excessive billing he caused to be made.

60.     Dr. Fishman's excessive billing included the following procedures:

   a.      Retinal photography where not medically needed;

   b.      Gonioscopy where not medically needed;

   c.      Improperly billing complex cataract surgery that was not medically necessary;

   d.      Engaging in excessive YAG laser capsulotomy for Dr. Fishman's personal benefit; and

   e.      Improperly billing eyelid surgeries in cases where the same were not indicated or adequately documented in the charts.

61.     The excessive billing in which Dr. Fishman engaged improperly increased the expenses to the Government and other payors while in many cases exposing the patients to unnecessary procedures or excessive procedures that were not medically indicated.

62.     The billing practices were not supported by the applicable standard of care, as Dr. Fishman then well knew.

63.     Dr. Fishman overbilled the patients knowingly, willfully, unlawfully, and for his own personal self-enrichment.

64.     Dr. Fishman acted, upon information and belief, with the specific intent to defraud the Government.

65.     The Government has been damaged as a result of Dr. Fishman's knowing misconduct.

WHEREFORE, Plaintiffs/Relators, on behalf of themselves and the Government, request this Court to:

a.      enter a judgment against Dr. Fishman in an amount equal to three times the amount of damages the Government has sustained as a result of Dr. Fishman's violations of the False Claims Act;

b.      enter a judgment against Dr. Fishman for a civil penalty of $10,000.00 for each of Dr. Fishman's violations of the False Claims Act;

c.      award Plaintiffs/Relators all costs of this action, with interest, including the cost to the Government for their expenses related to this action;

d.      award Plaintiffs/Relators all reasonable attorneys' fees in bringing this action;

e.      award Plaintiffs/Relators, for bringing this action, an amount of twenty-five percent (25%) of the proceeds of the action only in the event the Government proceeds with this action;

f.      award Plaintiffs/Relators, for bringing this action, and amount of thirty percent (30%) of the proceeds of the action only in the event the Government does not proceed with this action;

g.      award Plaintiffs/Relators prejudgment interest;

h.      order a trial by jury be held on all issues so triable; and

i.      provide any further relief the Court deems proper.

## COUNT II
### Violations of the False Claims Act—Dr. Sheridan

66.     This Count II is a claim for relief for Dr. Sheridan's violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

67.     Plaintiffs/Relators incorporate and reallege the allegations of Paragraphs 1–53.

68.     As described in this Qui Tam Complaint, Dr. Sheridan: (i) knowingly presented, or caused to be presented, to the Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

69.     The false claims were made or caused to be made by Dr. Sheridan, the processing and administration of which was unintentionally carried out by The Practice and under its Medicare number.

70.     Dr. Sheridan personally supervised the false billing and caused The Practice to submit it to the Government.

71.     Dr. Sheridan did so for his own financial benefit, pursuant to an employment agreement under which he personally benefitted from the excessive billing he caused to be made.

72.     Dr. Sheridan's excessive billing included:

    a.     Retinal photography where not medically needed;

    b.     Gonioscopy where not medically needed;

    c.     Unbundling of ptosis and blepharoplasty (eyelid) surgeries, and charging for both surgeries when they were not permitted to be billed separately; and

d.     Requiring support staff to repeat supportive testing for cataract and blepharoplasty surgeries until the results met Medicare criteria; and

e.     Billing for both ptosis and blepharoplasty when only one of the surgeries were actually performed on the patient.

73.     The excessive billing in which Dr. Sheridan engaged improperly increased the expenses to the government and other payors while in many cases exposing the patients to unnecessary procedures or excessive procedures that were not medically indicated.

74.     The billing practices were not supported by the applicable standard of care, as Dr. Sheridan then well knew.

75.     Dr. Sheridan overbilled the patients knowingly, willfully, unlawfully, and for his own personal self-enrichment.

76.     Dr. Sheridan acted, upon information and belief, with the specific intent to defraud the Government.

77.     The Government has been damaged as a result of Dr. Sheridan's knowing misconduct.

WHEREFORE, Plaintiffs/Relators, on behalf of themselves and the Government, request this Court to:

a.     enter a judgment against Dr. Sheridan in an amount equal to three times the amount of damages the Government has sustained as a result of Dr. Sheridan's violations of the False Claims Act;

b.     enter a judgment against Dr. Sheridan for a civil penalty of $10,000.00 for each of Dr. Sheridan's violations of the False Claims Act;

c.      award Plaintiffs/Relators all costs of this action, with interest, including the

cost to the Government for their expenses related to this action;

d.      award Plaintiffs/Relators all reasonable attorneys' fees in bringing this

action;

e.      award Plaintiffs/Relators, for bringing this action, an amount of twenty-five

percent (25%) of the proceeds of the action only in the event the

Government proceeds with this action;

f.      award Plaintiffs/Relators, for bringing this action, and amount of thirty

percent (30%) of the proceeds of the action only in the event the

Government does not proceed with this action;

g.      award Plaintiffs/Relators prejudgment interest;

h.      order a trial by jury be held on all issues so triable; and

i.      provide any further relief the Court deems proper.

## <u>COUNT III</u>
### Conspiracy to Commit Violations of the False Claims Act—Both Defendants

78.      This Count III is a claim for relief for Defendants' conspiracy to commit violations

of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* as well as 18 U.S.C. §§ 371, 372.

79.      Plaintiffs/Relators incorporate and reallege the allegations of Paragraphs 1–53.

80.      Beginning no later than 2013 and continuing to the present, in the Middle District

of Florida and elsewhere, Defendants Fishman and Sheridan knowingly, willfully and unlawfully

formed and organized a scheme to engage in unreasonable and unnecessary treatment of patients

and the improper billing of such patients and to make or cause to be made false claims to the

Government for their treatment of such patients and to conceal and cover-up their improper billing

for the treatment of such patients, and to aid and assist each other in order to avoid or deter the detection of their improper billing and medical practices, and did conspire and confederate together for such purposes, all in violation of the False Claims Act and of 18 U.S.C.§§ 371, 372.

81.    In furtherance of this conspiracy and in order to achieve the objects thereof Defendants did, among other overt acts, commit and cause to be committed the following overt acts in this District and elsewhere:

   a.    Defendants each filed or caused to be filed false or deceptive claims for Medicare reimbursement;

   b.    Defendants intimidated support staff in The Practice into repeating exams and tests on patients until the preferred but improper result was achieved;

   c.    Defendants also intimidated support staff from complaining about or making their own charts or other documents that would have revealed the lack of medical or other justification for the unnecessary or inflated procedures and false billing;

   d.    Defendants acted together to approve each other's false and deceptive billing practices and to resist any review of such billing as well as all proposals for self-reporting to the Government;

   e.    Defendants rejected all proposals within The Practice to obtain an independent audit of The Practice's billing practices, even at the initial expense of Dr. Pennachio;

   f.    As a delaying measure, Defendants agreed to six-month retrospective review of their procedures and then canceled the review after Dr. Pennachio

requested that the six months reviewed be selected from various billing periods in the past rather than for the immediately past six-month period;

g.     Defendants informed staff, including Ms. Drake, that if Dr. Pennachio proceeded any further toward an audit he would be voted out of The Practice which he had himself founded, intending to and creating a climate of intimidation in The Practice;

h.     Defendants threatened and intimidated Dr. Pennachio with termination of his employment and the loss of his interest in The Practice should he continue to demand an audit or self-report to the government; and

i.     Defendants blocked Dr. Pennachio from having any access to The Practice accounting and patient record database in order to prevent an audit by an outside auditor.

82.    Defendants' conspiracy to aid and abet one another to personally gain from the making of fraudulent billing claims permitted Defendants' excessive billing and deficient standards of care in the provision of medical services, as set forth more fully *supra*.

83.    Defendants carried out this scheme knowingly, willfully, unlawfully, and for their own personal self-enrichment.

84.    Defendants acted, on information and belief, with the specific intent to defraud the government and to aid and abet each other in such fraud.

85.    The Government has been damaged as a direct result of Defendants' scheme.

WHEREFORE, Plaintiffs/Relators, on behalf of themselves and the Government, request this Court to:

a.    enter a judgment against Defendants in an amount equal to three times the amount of damages the Government has sustained as a result of Defendants' violations of the False Claims Act;

b.    enter a judgment against Defendants for a civil penalty of $10,000.00 for each of Defendants' violations of the False Claims Act;

c.    award Plaintiffs/Relators all costs of this action, with interest, including the cost to the Government for their expenses related to this action;

d.    award Plaintiffs/Relators all reasonable attorneys' fees in bringing this action;

e.    award Plaintiffs/Relators, for bringing this action, an amount of twenty-five percent (25%) of the proceeds of the action only in the event the Government proceeds with this action;

f.    award Plaintiffs/Relators, for bringing this action, and amount of thirty percent (30%) of the proceeds of the action only in the event the Government does not proceed with this action;

g.    award Plaintiffs/Relators prejudgment interest;

h.    order a trial by jury be held on all issues so triable; and

i.    provide any further relief the Court deems proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs/Relators demand a trial by jury for all issues so triable.

Dated this 11th day of April 2017.

*s/ Stephen D. Milbrath*

**Stephen D. Milbrath, Esq. (Trial Counsel)**
Florida Bar No. 239194
**J. Carlos Real, Esq.**
Florida Bar No. 012869
**W. Colby Roof, Esq.**
Florida Bar No. 118888
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: SMilbrath@ByrdCampbell.com
Primary Email: CReal@ByrdCampbell.com
Primary Email: CRoof@ByrdCampbell.com
Secondary Email: SGaines@ByrdCampbell.com
Secondary Email: EOrtiz@ByrdCampbell.com
*Attorneys for Plaintiffs/Relators*

# COMPOSITE

# Exhibit

# "A"

S-1(2)

**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

# AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10/10

## STATEMENT

I was the practice director for TotalEyeCareCenter and have worked there for 24 years. My job involves the direction of staff + oversight of financial + clinical activities overall as well as to interact + take direction from each of the physicians. I am aware of the following:  for 2012 SD

- In 2014 when the M/c (Medicare) data for utilization was published we began internal comparisons + noticed some possible outliers for certain procedures - such as Complex cataracts, Gonioscopy + fundus photos esp.

- Discussions among the doctors was held to look at the data + ensure that the documentation in our charts met the M/c standard of medical necessity to justify billing.

- Over the next many mos Dr Fishman particularly stated he was making attempts to improve his chart documentation, handwriting, etc, but we continued to notice areas of possible concern regarding justified codes + billing. Dr Pennachio was concerned that the practice was or could be at considerable risk of financial overpayments based on overutilization of codes as well as a lack of medical necessity documentation.

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _8_ day of _FEBRUARY_, 20_17_, by (name of person making statement).

_Sharon Drake_
Printed Name of Affiant

_signature_
Signature of Notary

Personally Known ____ OR Produced Identification __✓__
Type of Identification Produced ___FLORIDA DRIVER LICENSE___

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE __3/__ OF __3__          CASE NO. __17-02003__

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: ~~Aaron Drake~~          DATE OF BIRTH: ~~10/0█~~

### STATEMENT

- The practice doctors disagreed and the mgt. probably z⎯z⎯r⎯s of the need to have a consultant work c us to identify over or under utilization of coding to improve billing + Minimize the risk of liability to the practice overall.
- All effort were met c resistance + only temporarily had an agreement to move forward c a lemo. retrospective review — before it was cancelled when Dr Fishman + Dr Sheridan said they would only be interested in looking at the prev. lemos + not back any further voluntarily. They were cautious about uncovering anything under the new M/C rules that would require self-reporting + correction.
- They felt the last lemo would show that they were improving documentation + that no significant findings of wrongdoing would be discovered + the voluntary audit would be a waste of time + money.
- I urged them - because of the ongoing disputes + uncomfortable atmosphere that has been created over these past few years

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _8_ day of _FEBRUARY_, 20_17_, by (name of person making statement).

_Aaron Drake_                    _[signature]_
Printed Name of Affiant          Signature of Notary

Personally Known _____ OR Produced Identification _✓_
Type of Identification Produced _FLORIDA DRIVER LICENSE_

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153    FloridaNotaryService.com

PAGE __2__ OF __3__          CASE NO. | 17-02-053 |

IA-13

**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake

DATE OF BIRTH: [redacted]

### STATEMENT

to let the professionals come in & help us learn what we are doing right or wrong & if everything is up to par - let the records speak for themselves. They continued to refuse any further audit or compliance review even when Dr Pennachio offered to pay for the audit himself. There was much bitterness & it became increasingly difficult to work between the 3 doctors because none no one was speaking to each other, and only directed comments + actions thru me which was very difficult to get anything accomplished. It became apparent to me that my fear of the practice breaking up "as threatened by Dr Sheridan would come true. He (Dr Sheridan) indicated that if Dr Pennachio proceeded ē an audit, that he (Dr S) & Dr F represented a majority in this org then he felt they could out vote him and that he (Dr P) would be in violation of his employment agreement or Bylaws if he proceeded on his own, against against the wishes of the other doctors.

STATE OF FLORIDA, COUNTY OF __LAKE__
Sworn to (or affirmed) and subscribed before me this _8_ day of _FEBRUARY_, 20_17_, by (name of person making statement).

Printed Name of Affiant

Signature of Notary

Personally Known ____ OR Produced Identification ✓
Type of Identification Produced _FLORIDA DRIVER LICENSE_

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _3_ OF _3_

CASE NO. _17-02-003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10-10-

### STATEMENT

In April last year when there were discussions about us engaging an audit to determine any liability of overpayts or improper coding or documentation of medical necessity, Dr. Fishman decided that he was not going to wait any longer to get his money out of the joint. — I disagreed c him because Dr P was out of town and Dr F wanted me to do it for him while Dr P was gone. He said that Dr P was a psycho and couldnt be trusted and he didnt have a choice. I said I disagree + that I would prefer to err on the side of status quo — we have left the money + they should together come to an agreement about it and that it wasnt fair to ask me to do it. Dr S got involved + it became very bad — yelling, threatening + intimidating. I almost felt I was going to have to quit then because they were so mad at me — Dr S the most and he didnt have anything to do with the

STATE OF FLORIDA, COUNTY OF ___LAKE___

Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____          _____
Printed Name of Affiant            Signature of Notary

Personally Known _✓_ OR Produced Identification _____
Type of Identification Produced _____

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _1_ OF _9_          CASE NO. _17·02·003_

IA-13



P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

**INTEGRITY ASSESSMENT**
Private Investigative Agency

## AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10-10-

### STATEMENT

surgery cntr. It was terribly threatening and an awful experience. Previously when Dr f asked me to do the same thing - he said his attorney (Mr. Pullum) said he could do it. But when Dr f said I could call for confirmation of that - Mr. Pullum said no. that I should not do it for anyone like that + should not be put in the middle that way. Dr Sheridan's behavior was so bad that day that staff members overheard him yelling at me over + over again + began talking about how bad things must be because Dr S was really yelling at Sharon. Things were never the same c̄ me + Dr Sheridan after that. Dr f later apologized for his actions + said it should never have happened. Dr S never acknowledged it again + in fact denied any recollection at all when the subject came up at a later time.

STATE OF FLORIDA, COUNTY OF __LAKE__
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____          _____
Printed Name of Affiant                 Signature of Notary

Personally Known __✓__ OR Produced Identification ____
Type of Identification Produced _____

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

Printed Name of Notary or Stamp

PAGE __2__ OF __9__          CASE NO. __17-02-003__

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake                    DATE OF BIRTH: 10-10-

### STATEMENT

Dr Sheridan has accused me of working to benefit Dr Pennacchio's new practice endeavor, he has called me to try to intimidate me to do things he insisted on - even though I had other instructions from Dr Fishman. He has made demands that were unreasonable and outside my scope of work or schedule. He has texted me late at night on a number of occasions to tell me what to do - almost always a unilateral decision unknown to Dr F and inconsistent c my previous understanding of something c Dr Fishman. There was little communication between the two & I was constantly being torn. Dr F had instructed me not to act on Dr S's demands + to run everything by him before doing anything because Jeff gets too excited and off the charts.

STATE OF FLORIDA, COUNTY OF _____LAKE_____
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____               _____
Printed Name of Affiant                Signature of Notary

Personally Known __✓__ OR Produced Identification ____
Type of Identification Produced _____

Printed Name of Notary or Stamp
**THOMAS B. MYSINGER**
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _3_ OF _9_            CASE NO. _17-02-003_

IA-13



**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10-10-▮

### STATEMENT

Dr. Sheridan continued to say, every time there was any disagreement ē Dr. Pennachio that he & Dr f were going to fire him one day for cause because he was crazy & unfit - And they could do it because they represented the majority 2/3 and that's all they needed to make it happen.
He also said that he would talk to anyone that Dr P tried to sell to or join partners with + make sure no one ever did when he got finished talking to them.

After giving my notice & announcing I would be going with Dr P things became worse with Dr Sheridan's treatment of me & my tolerance for him.

STATE OF FLORIDA, COUNTY OF ___LAKE___

Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____          _____
Printed Name of Affiant                    Signature of Notary

Personally Known __✓__ OR Produced Identification _____
Type of Identification Produced _____

Printed Name of Notary or Stamp   THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE __4__ OF __9__          CASE NO. _17·02·003_

IA-13



**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: ~~Sharon Drake~~                    DATE OF BIRTH: 10-10-

### STATEMENT

His constant sarcasm & intimidation - His constant
demands + outward mistrust and accusations
to me were all I could stand. I tried as
hard as I could to work c Dr F to help c a
smooth transition and help move forward for
everyone. I thought things would settle down
now + we could go separate ways.
Dr F understood the enormous stress I was under
+ the constant pressure + hostility with Dr S.
The last time Dr Sheridan yelled + screamed +
made unreasonable demands of me - Dr F told
me to ignore it + just help him do this + to hang
in there + not leave him. He acknowledged
that he had never seen me so upset + was genuinely
worried for my health and so was I. I was
having to take medication to calm my anxiety

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____                    _____
Printed Name of Affiant                     Signature of Notary

Personally Known _✓_ OR Produced Identification ____
Type of Identification Produced _____

Printed Name of Notary or Stamp

**THOMAS R. MYSINGER**
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _5_ OF _9_

CASE NO. _17-02-003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10-10-

### STATEMENT

just to get into work each day. The thought of another encounter was overwhelming because there was so much anger + hostility around me everyday. Between my BP being sky high and chest pains - it was obvious it had escalated to an unhealthy environment for me. Dr F and I discussed it and he agreed this was toxic for my health. I agreed and he asked me to wait a day to make my decision but understood if I needed to leave for my health.

It truly made me sick to see how it turned from getting Dr P out to let's crush him every way we can. I no longer wanted any part of it.

Dr. Fishman told me it probably was a

STATE OF FLORIDA, COUNTY OF __LAKE__

Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____          _____
Printed Name of Affiant                  Signature of Notary

Personally Known _✓_ OR Produced Identification _____
Type of Identification Produced _____

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153    FloridaNotaryService.com

PAGE _6_ OF _9_          CASE NO. _17·02·003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: ~~Sharon Drake~~          DATE OF BIRTH: 10-10-▮

### STATEMENT

a good time for me to leave because he
warned me that it was going to get a
lot worse before it got better - and that
now it was not only Dr Sheridan that wanted
to get him - that now he was even more than
Dr S going to make sure that he fought as
hard + more and that he would spend whatever
it took to do it. That was enough for me
to know they were more interested in
destruction on a personal level and not
resolution on a professional level. Dr F even
admitted that he may have partnered with the
wrong guy.

I also remember when DS texted me on
Jun 26 at 10pm to come to the Leesburg

STATE OF FLORIDA, COUNTY OF _LAKE_

Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

~~Sharon Drake~~          ~~W.R. My~~
Printed Name of Affiant          Signature of Notary

Personally Known _✓_ OR Produced Identification _____
Type of Identification Produced _____

Printed Name of Notary
**THOMAS R. MYSINGER**
NOTARY - COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _7_ OF _9_          CASE NO. _17·02·003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake

DATE OF BIRTH: 10-10-

### STATEMENT

and calling me the next morning to berate me about not doing what he wanted to work c his brother. I was constantly torn between the two doctors because they never were on the same page c anything anymore. I tried to comply on Monday when Dr. S's brother came to work c me. We reviewed several things and I shared c him the things I felt were most important to accomplish. He didn't want to work on the financial tasks as much as he wanted to understand the staff scheduling + how I grouped the resources. He said he was a CPA and should be able to follow the financials. The next day he said he would be back but he went to Eustis to work on write offs

STATE OF FLORIDA, COUNTY OF __LAKE__
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____
Printed Name of Affiant

_____
Signature of Notary

Personally Known __✓__ OR Produced Identification ____
Type of Identification Produced _____

Printed Name of Notary

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _8_ OF _9_

CASE NO. _17·02·003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Sharon Drake          DATE OF BIRTH: 10-10-

### STATEMENT

with Sarah. He called me later – or maybe
I called him I can't recall – but he said
he wouldn't be in Clermont afterall and would
see me the next day.
He came in the next day but it was
later in the morning and again he didn't
want to work on payroll when he learned
it wasn't pay day and continued to ask more
questions about scheduling. This ended up
being my last day and although my
plan was to work @ arm's length to help –
it became apparent that their goal was
not the same as mine and I was not
willing or able to stay any longer.

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_, by (name of person making statement).

_____          _____
Printed Name of Affiant          Signature of Notary

Personally Known _✓_ OR Produced Identification ____
Type of Identification Produced _____

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153    FloridaNotaryService.com

PAGE __9__ OF __9__          CASE NO. ___17-08-003___

IA-13



P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

# AFFIDAVIT

Personally came before me, the undersigned notary, the within named affiant makes his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:

In July 2016 I learned from a Medicare B update notice from First Coast (our MC carrier) about a coding change for Blephs + Ptosis surgery that confused me. It stated we were not permitted to bill both procedures in the ASC or by the physician - that it was a bundled procedure, 15823 + 67904.

I sent an email to the Director of Coding + Reimbursement c the Am. Academy of Ophthalmology asking about the notice. I was advised that we should not be billing both procedures together and that since April 2009 the bundling edit took place.

I explained that we did not know that previously and have been billing both but I would advise our doctors and stop billing both from here forward. I asked if I should do anything further. She advised that CMS is really enforcing the 7-yr. rule and if they want to Recoup - they will.

Affiant Signature

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _7_ day of _APRIL_, 20_17_, by _SHARON DRAKE_

THOMAS R. MYSINGER
Notary Stamp FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

Signature of Notary

Personally Known _✓_ OR Produced Identification ____ Type of Identification Produced_____

PAGE _1_ OF _3_                    CASE NO. ___17-02-003___

IA-12



P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

Personally came before me, the undersigned notary, the within named affiant makes his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:

I shared the information I learned c̄ all the doctors. Since Dr. Sheridan performed the majority of these procedures I had an additional face-to-face conversation c̄ him in Dr. Fishman's office in Leesburg. I shared the emailed information I received as well as discussed my concern about the 60-day payment rule c̄ Medicare and what I had learned previously about a practice's responsibility to self-report & correct overpayments. I told Dr. Sheridan that I had taken a quick glance at our billing over the past few years & was afraid the overpayment could be six-figures. I had also confirmed c̄ Sarah Dounders, the AR coordinator, that we were in fact billing both codes, and I instructed her that the doctors agreed to only bill one code from here forward and she would monitor the billing to insure we did.

Dr. Sheridan + I had a further discussion + I asked him how he wanted to proceed c̄ looking at the billing and he told me not to look at any

_Sharon Drake_
Affiant Signature

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _7_ day of _APRIL_, 20_17_, by _SHARON DRAKE_

THOMAS R. MYSINGER
MY COMMISSION # FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

_T. L. Mysinger_
Signature of Notary

Personally Known _✓_ OR Produced Identification ___ Type of Identification Produced_____

PAGE _2_ OF _3_                    CASE NO. _17-02-003_

IA-12



P.O. Box 955
Eustis, Fl. 32727-0955

**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

352-357-4700
www.integrityassessmentpi.com

# AFFIDAVIT

Personally came before me, the undersigned notary, the within named affiant makes his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:

further data - that we would stop billing both + that M/C shouldn't have paid us for both if it wasn't appropriate. I explained that M/C doesn't look at it that way & that we are still obligated to repay any overpayments regardless of who identifies it. He said to leave it alone and that the 60-day clock doesn't start until we become aware of a problem and that as of now we have not been notified of a problem. I reminded him that the information I had read said when the overpayment is identified it is supposed to be reported or there could be even more penalties or fines. He still did not want to do anything more about it other than to stop billing both procedures + didn't feel this was considered identification of a problem.

Affiant Signature

STATE OF FLORIDA, COUNTY OF _LAKE_____
Sworn to (or affirmed) and subscribed before me this _7_ day of _APRIL_, 20_17_, by _SHARON DRAKE_

THOMAS R. MYSINGER
Notary Stamp
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

Signature of Notary

Personally Known ✓ OR Produced Identification ___ Type of Identification Produced_____

PAGE _3_ OF _3_          CASE NO. _17-02-003_____

IA-12

# Exhibit "B"

S-1 (3)



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME. Vicki Tracy, COT OSC    DATE OF BIRTH. 7-16-

### STATEMENT

During my employment as a COT c Tecc I had some experiences that I felt needed to be mentioned las they did not live up to the standard of our practice M case. There were occasions after the split of the practice was announced that Dr Sheridan too told an employee Kristy Jovel who was an optician trainee & had minimal experience as a tech to have me show her a 'IOL MASTER I showed her 1 - IOL Master and after that he felt that she had enough training to do this test which is done to choose intraocular lens implants for surgeries. As his lead tech for years I was primarily responsible & it was unheard of for him to allow someone to perform that type of testing after seeing it done once. There were other employees Blaine Massey who also were now performing technician workups without experience. Dr Fishman would specifically tell me when seeing a

STATE OF FLORIDA, COUNTY OF __Lake.__
Sworn to (or affirmed) and subscribed before me this 13 day of March. 20 17 by (name of person making statement)

Vicki C. Tracy
Printed Name of Affiant

Signature of Notary

Personally Known __✓__ OR Produced Identification
Type of Identification Produced

Printed Name of Notary or Stamp

**THOMAS R. MYSINGER**
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153    FloridaNotaryService.com

PAGE 1 OF 5    CASE NO 17-02-003



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME. _Vicki Tracy, COT OSC_     DATE OF BIRTH. _7/16/___

### STATEMENT

pt with an eyeglass complaint to "just get rid of them so I don't have to see them." Dr. Sheridan & Dr. Pernachio each would be consulting about their patients eyeglasses about their glasses checks. Dr. Fishman ordered above recommended protocol of optic nerve photos than the other 2 doctors. In addition. He refused use of OCT for optic nerve or ~~macula~~ MENT macular for a few years because he didn't feel it offered any information ~~even~~ tho his partners ensured him that it did. — ~~when he finally MENT~~ When he finally started to utilize the technology he (to me) admitted that it gave him much more information & that he wished he used it sooner. Many times I had to point out I'd always felt that Dr. Fishman didn't care about work abnormal pathology he walked around the halls waiting for his next findings to vacation & would zoom out of the office ASAP He was ~~the dr Fish~~ in & off of the room's & the patients in just a Dr Fishman few minutes. He allowed techs that worked with not noted in the pt record. Ex Hollenhorst Plaque. on fundus pho-

STATE OF FLORIDA, COUNTY OF ___LAKE___
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_ by (name of person making statement)

_Vicki C Tracy_
Printed Name of Affiant

_____
Signature of Notary

Personally Known _✓_ OR Produced Identification ____
Type of Identification Produced _____

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _2_ OF _5_        CASE NO [ _17-02-003_ ]



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME. Vicki C Tracy COT· DSC          DATE OF BIRTH. 7/16/

### STATEMENT

him to take short cuts that could have possibly
led him to a different conclusion. Patients that
were worked up for the — Dr Fishman or Dr. Sheridan
were often not given the same standard or because they were
protocol of a work up because they were told to        lazy or to
"hurry up." - being a head tech, & mostly
working c Dr. Sheridan I saw the patient work up,
I was often called in after the doctor saw the
patient to do the things the other (first tech)
had not done). When these same techs worked
with Dr. Pennachio they would be more careful to
Dot their i's & cross their t's. because Dr. Pennachio
did not allow sloppy work to go by him. He is meticulous.
That is the major reason I chose to work with him
because of his care for the patient is first always.
When the practice meeting was held & Dr. Fishman
told us about the plans he & Dr. Sheridan had made

STATE OF FLORIDA, COUNTY OF __LAKE__
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_, 20_17_ by (name of person making statement)

Vicki C. Tracy
Printed Name of Affiant

_____
Signature of Notary

THOMAS R. MYSINGER
MY COMMISSION #EE047332
EXPIRES August 21, 2017
(407) 398-0153    FloridaNotaryService.com

Printed Name of Notary

Personally Known ✓ OR Produced Identification ____
Type of Identification Produced ____

PAGE __3__ OF __5__          CASE NO. [ 17·02·003 ]



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME. _Vicki C Tracy, COT, OSC_ DATE OF BIRTH. _7-16___

### STATEMENT

he assured all employees would have jobs. I wanted to work with Mr. Pennachio, however I have had a desire to be in management after 41 years. So when Mr. Fishman asked me if I was staying with him I told him only if it was in a management capacity. He said they wouldn't make that decision for ~ 6 months & Jeff & himself would handle it til then, this was on Sat. 1-28. I told him, I could not work with him & Jeff not knowing their permanent leadership situation. At that point he said I could work at his practice until I was ready to start c patients c Dr. Pennachio. He also wanted me to continue with Staff Schedule which, I did. On Monday 3/30/17 Dr. Sheridan comes in c his brother Tim Sheridan, & announced he is our new office manager. I asked Dr. Sheridan when this decision was made c he had said Thursday of the prior week. Which meant that Mr. Fishman lied to me regarding plans for Administrative positions. I continued to work as a ~~tec~~ head tech

STATE OF FLORIDA, COUNTY OF _LAKE_
Sworn to (or affirmed) and subscribed before me this _13_ day of _MARCH_ 20_17_. by (name of person making statement)

_Vicki C Tracy_
Printed Name of Affiant

Signature of Notary

THOMAS R. MYSINGER
MY COMMISSION #FF097332
EXPIRES August 21, 2017
(407) 398-0153     FloridaNotaryService.com

Printed Name of Notary or Stamp/Seal

Personally Known _____ OR Produced Identification _____
Type of Identification Produced _____

PAGE _4_ OF _5_

CASE NO _17·02·003_

that I needed to teach him how to do the staff scheduling. I told him that I would when I got back from vacation. He kept hounding me (Tim Sheridan) & made me change offices on a Friday to work in Eustis where it was very busy. I was busy with pts until 4:30pm that day. He never mentioned the schedule. At 4:30pm I asked him if he wanted to go over the ~~surgery~~ Staff Scheduling + I spent the rest of the time in the day teaching him how to do the schedule. MEVLT It was during this time I found out that he had Sharon Erdman go into my file & get my template for scheduling. After the scheduling school was over, he asked me if I had another minute & he waited for staff to leave + then started to demand that I give him a date that I was resigning. I told him my intention was to stay working with Sheridan & Fishman as long as possible because I enjoyed my patients + liked to follow their progress. - He ~~Stats~~ MEVLT still demanded a date & tried to ~~stare~~ MEVLT stare me down or intimidate me. The following week was vacation for me. I came back to work on 2/27/16 worked all day. On Tuesday after lunch 2/28/16 Tim Sheridan called me into "his" office + told me that he was terminating my employment effective immediatly with no reason given.

I asked for my 80 hrs of vacation time & severance pay since I had been employeed ~~by~~ TECC for 17 yrs & was assured by Dr. Fishman that I could stay as long as ~~I~~ I wanted. Once again another ~~tied~~ lie. It was also discovered by this time that in Feb. they hired Blake Griswold to be their practice administrator. Bottomline there were multiple lies + patient care protocol breakdowns that I wished to disassociate myself from anyway + there was no 5/5 VC

# Exhibit

# "C"

S - 1 (4)



**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

# AFFIDAVIT

**NAME:** Elisabeth Dericus

**DATE OF BIRTH:** 03/11/▮

## STATEMENT

I am a certified ophthalmic technician and have worked for Drs Michael Pennachio, Craig Fishman, and Jeffry Sheridan for 5 years.

A few years ago, while working in clinic with Dr. Fishman, I worked up a patient for a pre op for a YAG laser surgery. After Dr. Fishman saw this patient, he came out of the exam room and started to tear up and throw away my exam sheet. When I asked him what he was doing, he told me I couldn't write the results of the glare test because then he wouldn't be able to perform the surgery on the patient.

Last week my coworker Shannon began to call Dr. Pennachio patients that were scheduled in March for exams to re-schedule their appointments. While speaking to the patients she told them Dr. Pennachio is no longer with us and they could re-schedule their appointments with Dr. Fishman or Dr. Sheridan.

STATE OF FLORIDA, COUNTY OF _LAKE_____
Sworn to (or affirmed) and subscribed before me this _10_ day of _February_, 20_17_, by (name of person making statement)..

_____
**Printed Name of Affiant**

_____
**Signature of Notary**

Personally Known _____ OR Produced Identification _✓_

Type of Identification Produced _FLORIDA DRIVER LICENSE_

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
FloridaNotaryService.com

PAGE _1_ OF _3_

CASE NO. _17-02-003_

IA-13



**INTEGRITY ASSESSMENT**
Private Investigative Agency

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Elisabeth Petrous                 DATE OF BIRTH: 03/11/█

### STATEMENT

She then began to tell the patients about the new office they are opening after we close the current Eustis location. I questioned her with what she was telling the patients since she wasn't explaining to them that Dr. Pennachio will continue practicing. She told me that she was told by Tim and Sarah that she was legally allowed to tell the patients when Dr. Pennachio's last day was and that he will no longer be with us.

In the past I have had a coworker ask me why Dr. Fishman schedules so many more Tonics than Dr. Pennachio and Dr. Sheridan. It happened on more than one occasion and was asked by Testing Technicians.

Years ago while working with a co worker Blake, Dr. Fishman had a tech schedule a YAG laser. When another co worker questioned why he was scheduling another YAG since the

STATE OF FLORIDA, COUNTY OF _LAKE_
Sworn to (or affirmed) and subscribed before me this _10_ day of _FEBRUARY_, 20_17_, by (name of person making statement)

_____
Printed Name of Affiant

_____
Signature of Notary

Personally Known _____ OR Produced Identification _____
Type of Identification Produced _____

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 398-0153   FloridaNotaryService.com

PAGE _2_ OF _3_           CASE NO. _17-02-003_

IA-13



**INTEGRITY ASSESSMENT**
**Private Investigative Agency**

P.O. Box 955
Eustis, Fl. 32727-0955

352-357-4700
www.integrityassessmentpi.com

## AFFIDAVIT

NAME: Elisabeth Octesus            DATE OF BIRTH: 03/11/

### STATEMENT

patients vision wasn't bad, Blake stated Dr. Fishman has to pay for his son's college education. / ED

STATE OF FLORIDA, COUNTY OF __LAKE__
Sworn to (or affirmed) and subscribed before me this _10_ day of _FEBRUARY_, 20_17_, by (name of person making statement).

_____            _____
Printed Name of Affiant                     Signature of Notary

Personally Known ____ OR Produced Identification ✓
Type of Identification Produced _FLORIDA DRIVER LICENSE_

Printed Name of Notary or Stamp

THOMAS R. MYSINGER
MY COMMISSION #FF047332
EXPIRES August 21, 2017
(407) 356-0153    FloridaNotaryService.com

PAGE _3_ OF _3_          CASE NO. _17-02-003_

IA-13

# Exhibit

# "D"

S— ( (5)

# YTD PROCEDURE UTILIZATION ANALYSIS BY DOCTOR

## BY VOLUME

**2014**

Source: ProPublica.org and Practice Reporting

| PROCEDURE NAME | CPT | FISHM | | Top 10 Ranked Utilization (2012 M/C data) by Provider — FISHM | Avg. Util. Ranking in State |
|---|---|---|---|---|---|
| COMPREH NEW PT | 92004 | 665 | | 8 | 14 |
| COMPREH EST PT | 92014 | 2969 | | 1 | 1 |
| TOTAL COMPREH | | 3634 | | | |
| OV - EXP PROBL FOCUS | 99213 | 2 | | 3 | 21 |
| OV - PROBL FOCUSED | 99212 | 149 | | | 2 |
| INTERM EYE EXAM | 92012 | 1901 | | | |
| REFRACTION | 92015 | 2109 | | | |
| PHACO W/IOL | 66984 | 233 | | | 13 |
| PHACO, COMPLIC | 66982 | 45 | | | |
| YAG LASER | 66821 | 209 | | 10 | 22 |
| TOTAL PHACO | | 278 | | | |
| EXC BENIGN LESION | 11440 | 0 | | | |
| BLEPHAROPLASTY | 15823 | 13 | | | |
| REMOVE FB | 65210 | 2 | | | |
| REMOVE FB | 65222 | 9 | | | |
| INJECTION OF EYE | 67028 | 1 | | | |
| EXC CHALAZION | 67800 | 0 | | | |
| EXC CHALAZION, MULT | 67801 | 3 | | | |
| EXC BENIGN LESION | 67840 | 38 | | | |

| PROCEDURE NAME | CPT | | FISHM | | Top 10 Ranked Utilization (2012 M/C data) by Provider | | | Avg. Util. Ranking in State |
|---|---|---|---|---|---|---|---|---|
| | | | | | | FISHM | | |
| PTOSIS REPAIR | 67904 | | 9 | | | | | |
| CLOSE TEAR DUCT | 68760 | | 12 | | | | | |
| PLUG TEAR DUCT | 68761 | | 56 | | | | | |
| DILATE LACRIMAL | 68801 | | 0 | | | | | |
| PACHYMETRY | 76514 | | 107 | | | | | 29 |
| GONIOSCOPY | 92020 | | 694 | | | 6 | | 19 |
| VISUAL FIELD | 92083 | | 688 | | | 4 | | 7 |
| OCT - NERVE (DISC) | 92133 | | 301 | | | 5 | | 10 |
| OCT - RETINA (MAC) | 92134 | | 126 | | | 9 | | 4 |
| IOL-M | 92136 | | 285 | | | 7 | | 15 |
| FUNDUS PHOTO | 92250 | | 1264 | | | 2 | | 8 |

**PROCEDURE UTILIZATION REVIEW**
**PERIOD:    2015**

| | PROCEDURE | DESCRIPTION | TOTAL UNITS | | |
| --- | --- | --- | --- | --- | --- |
| | | | | FISHMAN | |
| 1) | 66821 | YAG LASER | | 207 | |
| 2) | 66982 | PHACO / COMPLEX | | 36 | |
| 3) | 66984 | PHACO | | 190 | |
| 4) | 67840 | EXC BENIGN LESION | | 50 | |
| 5) | 68760 | PUNCTAL OCCLUSION | | 14 | |
| 6) | 68761 | PUNCTAL PLUGS | | 37 | |
| 7) | 92020 | GONIOSCOPY | | 749 | |
| 8) | 92133 | SCAN, DISC | | 747 | |
| 9) | 92134 | SCAN, RETINA | | 313 | |
| 10) | 92250 | FUNDUS PHOTOS | | 408 | |
| | | | | | |
| | 92014 | COMPLETE EXAM, EST PT | | 2954 | |
| | 92004 | COMPLETE EXAM, NEW PT | | 689 | |
| | | | | | |
| | | | | | |
| | | | | | |

# Exhibit "E"

S-1(6)

## COMPLEX CATARACT CODING

- Consultant provided monograph for Medicare reimbursement of Complex Cataract surgery (PDF attached)

- Monograph/Consultant confirms:

  o Mechanical dilation of the pupil is an acceptable cause to use the complex code – but should be described in the Op Report indicating when it occurred and the indication for its use;

  o Other acceptable causes for complex coding are: suture of IOL haptics and implantation of a capsular tension ring;

  o Trypan Blue does not meet the time, work or intensity necessary to report the complex cataract code;

  o Only 4 Medicare contractors currently allow the non-routine use of dye in dense, mature, or hypermature cataracts as complex surgery.  Our carrier is not one of the 4 currently listed as of March 2016.

# Exhibit

# "F"

S-1 (7)

**ALLEN**

**DYER**

**DOPPELT**

**MILBRATH &**

**GILCHRIST, P.A.**

INTELLECTUAL PROPERTY ATTORNEYS

Herbert L. Allen
Ava K. Doppelt
Stephen D. Milbrath
Brian R. Gilchrist
Christopher F. Regan
David L. Sigalow
Richard K. Warther
Michael W. Taylor
John F. Woodson II
Stephen H. Luther
Jeffrey S. Boyles

Ryan T. Santurri
Robert H. Thornburg
Jack G. Abid
David S. Carus
Justin R. Sauer
Allison R. Imber
Jaafar Choufani
Matthew G. McKinney
Brock A. Hankins

Registered Patent Agent
W. Grace Zhao, Ph.D.

smilbrath@addmg.com

May 24, 2016

Dr. Craig D. Fishman and
Dr. Jeffrey A. Sheridan
Pennachio & Fishman, M.D., P.A.
640 S. Lake Street
Leesburg, FL 34748

Re: Medicare-Related Audit: Confidential Communication

Dear Drs. Fishman and Sheridan:

I write on behalf of Dr. Michael Pennachio in order to officially communicate to you Dr. Pennachio's concerns about the need for a suitable audit of an adequate sample of patient charts by an audit specialist of the procedures of the three shareholders in the practice, including those of Dr. Pennachio himself. I also address below a proposed new clause in the employment agreement of the three shareholders.

As you are aware, Dr. Pennachio is quite concerned about the potential risks to Pennachio & Fishman, M.D.P.A. (hereafter, the "PA") from possible overpayments to the P.A. arising from the possible over-utilization of certain procedures in the past, dating back perhaps as much as three years, and particularly with reference to the procedures of Dr. Fishman. As Dr. Pennachio has explained to you, he has concerns that Dr. Fishman's billings in the past three years have involved poorly documented or unsuitable tests and procedures that could create a liability on the part of the P.A. to the government. He has shared with you his concerns in detail and has pointed out that the regulations of the Centers for Medicare & Medicaid Services ("CMS") contemplate, and may even require, self-reporting of overpayments, and the failure of the practice to address such overpayment liability could create the risk of liability by the PA and by its shareholders individually to CMS under many federal statutes, including the False Claims Act.

The best way to determine if there is a need on the part of the P.A., or any individual physician in the P.A., to self-report to CMS is to commission an appropriate audit of a suitable sample of patient charts over the

---

**Orlando Office (Main)**
255 South Orange Ave.
Suite 1401
Orlando, FL 32801
Mail To: P.O. Box 3791
Orlando, FL 32802-3791

tel: 407-841-2330
fax: 407-841-2343

**Winter Springs Office**
1135 E. State Road 434, Suite 3001
Winter Springs, FL 32708
tel: 407-796-5051 fax: 407-796-5065

**Miami Office**
1221 Brickell Ave., Suite 2400
Miami, FL 33131
tel: 305-374-8303 fax: 305-374-8306

**Jacksonville Office\***
4720 Salisbury Road
Jacksonville, FL 32256
tel: 904-398-7000 fax: 904-398-7003

**Tampa Office\***
2202 N. West Shore Blvd., Suite 200
Tampa, FL 33607
tel: 813-639-4222 fax: 407-841-2343
\*Satellite Office

www.addmg.com



Dr. Craig D. Fishman and
Dr. Jeffrey A. Sheridan
May 24, 2016
Page 2

relevant time period. Dr. Pennachio has proposed such an audit. He has also proposed for purposes of fairness that the charts of all three shareholders in the practice be sampled, and that the P.A., arrange for such a study for a look-back of three years. Dr. Pennachio has also identified an auditor credentialed to perform the requisite audit for the relevant ophthalmology procedures. Thus far you have rejected this proposal, and have even refused to allow Dr. Pennachio to commission such a study himself, though he is president of the PA. You are apparently now proposing an audit of only the most recent six months of procedures. I urge you to reconsider this view in light of the potential risks to the PA that you are thereby creating.

While Dr. Fishman believes that his prior billing for the proposed look-back period was appropriate and that an audit would reflect that he has performed only medically necessary and properly documented procedures, the fact remains that he is among the highest billers to CMS in your specialty. Moreover, spot checks by Dr. Pennachio have raised concerns about Dr. Fishman's past procedures, as he has explained to you both in the past. If these concerns are realistic, as Dr. Pennachio believes they are, then Dr. Fishman has a fiduciary duty to the PA, and to its shareholders and creditors, to rectify the problem before CMS performs its own study, which could put all three of you in financial and legal peril. This is a risk that no prudent lawyer, if aware of the facts, could ignore.

I accordingly urge you to consult personal counsel about this matter immediately and permit a further discussion by the shareholders and directors of this issue, at your earliest convenience. If Dr. Fishman's procedures can be defended, in spite of his high volume, as measured by CMS, then he has nothing to fear from agreeing to an audit. On the other hand, if he has created, however innocently, an overpayment liability to the PA, it is his obligation to address the matter. Hiding from that risk is not acceptable, particularly in view of the fact that Dr. Fishman is a director of the PA.

In order to save the PA of the risks outlined above, Dr. Pennachio would like your agreement to amend the employment agreements of the three shareholders to provide the following additional protective measures:

In the event Employer (the PA) becomes liable, or any shareholder in the PA should become derivatively liable, to any government entity, state or federal, including but not limited to the United States or the Centers for Medicare & Medicaid Services (CMS), for any alleged overbilling or fraud or false claim or other incident of overbilling, Employee shall immediately reimburse Employer for all costs and attorneys' fees and all other damages sustained by Employer or by any shareholder in Employer as the result of Employee's billing or coding or overbilling, whether caused by Employee's wrongful acts or by any form of carelessness or negligence or poor documentation or any other circumstance by which Employer and/or a shareholder in Employer other than employee shall suffer any liability or damages as the result of the billing of Employee. Employee shall also indemnify and hold Employer harmless from and against any and all liability, claims, damages, attorneys' fees or other loss caused by Employee's faulty billing, regardless of the circumstances.

Dr. Pennachio proposes to hold a directors and shareholders meeting to amend the employment agreement and to draft a new shareholder agreement to include a provision like that set forth above. He hereby solicits your approval of this provision in advance of noting such a meeting.

Dr. Craig D. Fishman and
Dr. Jeffrey A. Sheridan
May 24, 2016
Page 3


I would like to hear from your personal counsel about the above at your earliest convenience. Please understand that Dr. Pennachio wishes no ill-will to Dr. Fishman and he makes the requests herein only out of concern for protecting the assets of the P.A., and of its individual physicians, from potential liability.

Respectfully,

Stephen D. Milbrath
(signed in his absence to avoid delay)


cc: Dr. Michael Pennachio

# Exhibit "G"

S - 1 (8)



Leesburg Office
640 S. Lake Street
Leesburg, FL 34748

Clermont Office
14244 S.R. 50
Clermont, FL 34711

Eustis Office
1100 S. Grove Street
Eustis, FL 32726

www.totaleyecarecenter.com     •     352-728-1717   •   Toll Free 1-877-739-3227 (1-877-7-EYECARE)

4/20/16 - Read to Dr F per
Request /s/d

June 16, 2016

Dr. Fishman,

I have reviewed 13 toric IOL charts and 2 show square edged toric IOLs placed in patients with compromised capsules. One required multiple surgeries for retained lens material and retinal detachments with residual decreased vision. Another patient has vitreous in the anterior chamber and a small pupil after dilating drops. I examined the patient and I am unable to see if the haptics are in the bag.

Of the remaining 11 patients, I found 4 that had eyes that the post op refractive astigmatism was the same or worse than pre op. I have been told you now rarely mark the axis in the OR despite signing the OP note that states you did. I believe the standard of care is to mark the axis in the OR by many different means but it is not the standard to not mark if the axis is within 20 degrees of the marks made in pre op area for vertical and horizontal.

I have instructed Rhonda to tell the circulating nurses to mark out the part in the OP note that states you marked in the OR if you have not done so and ask you to initial it. I am also asking you to identify all patients you did not mark and amend the OP notes appropriately.

You also, in my opinion, have a high number of complications including retained lens material in small pupil cases. One patient may have had to have a DSEK for persistent corneal edema and there have been multiple returns to the OR. I believe the standard of care in those patients is no longer stretching but using pupillary expanding devices like iris hooks or rings. As one of the owners of the surgery center I am asking you to demonstrate appropriate use of those devices in small pupil cases. If you need training in the indications or use of those devices Dr. Sheridan has offered to help. You will be required to mark all patients' axis in the OR and no longer state you marked when you did not. These recommendations are to apply upon your receipt of this letter.

(not signed to expedite delivery)

Michael Pennachio, MD

---

**Michael P. Pennachio, M.D.**
Board Certified - Ophthalmology

**Craig D. Fishman, M.D.**
Board Certified - Ophthalmology

**Jeffrey A. Sheridan, M.D.**
Board Certified - Ophthalmology

# Exhibit "H"

S-1(9)

**Stephen Milbrath**

| | |
|---|---|
| **From:** | Michael Pennachio <pennachio@mac.com> |
| **Sent:** | Wednesday, April 05, 2017 6:29 AM |
| **To:** | Stephen Milbrath |
| **Subject:** | Fwd: practice issues |

Begin forwarded message:

**From:** Michael Pennachio <pennachio@me.com>
**Subject: practice issues**
**Date:** June 20, 2016 at 8:06:08 AM EDT
**To:** Craig Fishman <cdfishman@gmail.com>
**Cc:** Jeff Sheridan <peachjs@gmail.com>, sharon drake <sdrake@totaleyecarecenter.com>

Craig,
I am back at my computer and can give a more complete response. You have cut and pasted history to suite your agenda. You present it that I am greedy and my attempts to correct documented billing and medical issues as an attack and baseless. Yet you refuse the audit that would confirm whether my accusations are baseless. You left out that about 24 hours after I was discharged from an intensive care unit in New Orleans I accepted your last offer and you and Jeff both rejected it. You had found out that you did not have to pay me any goodwill and as the founder of this practice I would be left with only the salvage value of my share of the equipment. You had previously thought goodwill was fair. I attempted mediation this time last year and after thousands of dollars in attorney's fees your last offer was real estate values that were almost two years old and salvage value of the equipment. One of the primary reasons I was going to retire was that I was increasing frustrated with my attempts to modify my billing and surgical problems. I did not tell you that because I was still trying to preserve a friendly relationship.
Your statement regarding the consultant is not a clear picture of what really happened. Her initial response was evaluating all the data for all doctors combined. She subsequently reviewed the doctors data individually and found that the whole practice looked alright only because of under coding by Me. She also went on to say you are an outlier in fundus photos, YAG laser capsulotomy, gonioscopy and complex cataracts. The six month recommendation was a quote for areas to improve not to quantify any coding in the past that the practice may be liable for. If you are confident a Medicare audit would be clean why not have a privater review first to confirm that, as my attorney has suggested. Also despite your insistence that your billing is clean you refuse to amend our agreement to hold your partners harmless if your billing results in sanctions. If you think your billing is all medically necessary why would you consider a private review back to 2012 punitive even though I offered to pay the entire amount of the review. Your also state you feel your quality is good. Yet you have a higher rate of known complications from small pupils than your partners but refuse to use pupil expanding devices. You also have a higher rate of post op corneal edema but have refused to alter your technique. I recently reviewed your post op refractive errors in your Toric cases and your results are not within the standards one would expect. The problem is there is no documentation of

1

discussions with the affected patients about correcting the problem and you are not practicing the standard of care in marking during surgery yet everything is alright. You in the past have also stated you used the entire syringe of lidocaine intra op and were unaware of the studies of the toxicity of lidocaine in the anterior chamber and the standard is .1cc. You also despite no known publications or lectures advocating your technique for vision blue you do not place vision blue under air or viscoelastic. I have a problem that when I bring these problems up to my partners I am told I am angry that I did not get my way in the buy out negations and that is why I am attacking you. If your statements are correct why object to obtaining the data to exonerate yourself. I take your examples of my possible problem cases seriously and will work with you and Dr. Sheridan to correct any of my shortcomings.

Mike

# Exhibit

## "I"

S-1 (10)

UnitedHealthcare Payment Integrity
1021 Windcross Court
TN-041-1021
Franklin, TN 37067



June 24, 2016

••••••••••••••••••••AUTO**MIXED AADC 553
CRAIG D FISHMAN
640 S LAKE ST
LEESBURG, FL 34748-5927



0001066

161

ıJlılıʼıJJlıʼlıılıJJlLıⁿJllⁱʼʼⁱlⁱⁱllⁱⁱⁱlⁱⁱⁱlⁱlⁱⁱⁱllⁱlⁱⁱllⁱⁱⁱⁱll

Letter Reference No:  CATS-FL-4748-7971-CRAI

Re: Utilization Report for High Use of Complex Cataract Surgery Codes

Dear Craig D Fishman:

UnitedHealthcare looks for opportunities to help care providers improve payment accuracy. During a recent review of claim submissions, we identified the following trend in your practice as compared to others practitioners billing the same codes:

High use of complex cataract surgery codes

Cases coded as complex cataract (CPT 66982) must have indications for using that code dictated within the body of the operative note as well as in the physician's office notes. Please ensure that code 66982 is being used only in instances requiring devices or techniques not generally used in routine cataract surgery (eg, iris expansion device, suture support for intraocular lens, or primary posterior capsulorrhexis) or performed on patients in the amblyogenic developmental stage.

The enclosed report includes specific data about your practice's coding and billing history. It may assist you with avoiding delays in claims payment and reduce future medical record audits.

*Proper billing can help ensure timely and accurate reimbursement so we encourage you to evaluate your billing practices to help determine whether your billing is consistent with the services performed.*

Any final resolution reached by the health plan in no way binds the State of Florida nor precludes the State of Florida from taking further action for the circumstances that brought rise to the matter.

Insurance coverage provided by or through UnitedHealthcare Insurance Company, All Savers Insurance Company or its affiliates. Health plan coverage provided by UnitedHealthcare of Arizona, Inc., UHC of California DBA UnitedHealthcare of California, UnitedHealthcare of Colorado, Inc., UnitedHealthcare of Oklahoma, Inc., UnitedHealthcare of Oregon, Inc., UnitedHealthcare of Texas, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare of Utah, Inc. and UnitedHealthcare of Washington, Inc. or other affiliates. Administrative services provided by United HealthCare Services, Inc. OptumRx, OptumHealth Care Solutions, Inc. or its affiliates. Behavioral health products are provided by U.S. Behavioral Health Plan, California (USBHPC), United Behavioral Health (UBH) or its affiliates.

Charts based on UnitedHealthcare paid claims data for Commercial, Medicaid, & Medicare, where applicable.

Doc# PCA-1-000579-01072016  032301G

We may conduct a future review of your practice's claim submissions to determine if they adhere to standard coding and billing requirements, which are based on common application of CPT© coding requirements defined by the American Medical Association, the Centers for Medicare & Medicaid Services' National Correct Coding Initiative and UnitedHealthcare policy.

If you have any questions, please call (888) 702-3159. Thank you.

Sincerely,

*Janice Huckaby MD*

Janice Huckaby, M.D., Chief Medical Officer, East Region

Enclosure

Any final resolution reached by the health plan in no way binds the State of Florida nor precludes the State of Florida from taking further action for the circumstances that brought rise to the matter.

Insurance coverage provided by or through UnitedHealthcare Insurance Company, All Savers Insurance Company or its affiliates. Health plan coverage provided by UnitedHealthcare of Arizona, Inc., UHC of California DBA UnitedHealthcare of California, UnitedHealthcare of Colorado, Inc., UnitedHealthcare of Oklahoma, Inc., UnitedHealthcare of Oregon, Inc., UnitedHealthcare of Texas, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare of Utah, Inc. and UnitedHealthcare of Washington, Inc. or other affiliates. Administrative services provided by United HealthCare Services, Inc. OptumRx, OptumHealth Care Solutions, Inc. or its affiliates. Behavioral health products are provided by U.S. Behavioral Health Plan, California (USBHPC), United Behavioral Health (UBH) or its affiliates.

Charts based on UnitedHealthcare paid claims data for Commercial, Medicaid, & Medicare, where applicable.

Doc#: PCA-1-000579-01072016  0323016



# Billing Utilization Report

This billing utilization report is based on a review of high use of complex cataract surgery codes. The review included a national comparison of peers who billed the same codes. The review showed that your practice billed complex cataract surgery codes more often than national benchmarks.



| Tier | CPT® Code(s) |
|--------|--------------|
| Tier 1 | 66984 |
| Tier 2 | 66982 |

Any final resolution reached by the health plan in no way binds the State of Florida nor precludes the State of Florida from taking further action for the circumstances that brought rise to the matter.

Insurance coverage provided by or through UnitedHealthcare Insurance Company, All Savers Insurance Company or its affiliates. Health plan coverage provided by UnitedHealthcare of Arizona, Inc., UHC of California DBA UnitedHealthcare of California, UnitedHealthcare of Colorado, Inc., UnitedHealthcare of Oklahoma, Inc., UnitedHealthcare of Oregon, Inc., UnitedHealthcare of Texas, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare of Utah, Inc. and UnitedHealthcare of Washington, Inc. or other affiliates. Administrative services provided by United HealthCare Services, Inc. OptumRx, OptumHealth Care Solutions, Inc. or its affiliates. Behavioral health products are provided by U.S. Behavioral Health Plan, California (USBHPC), United Behavioral Health (UBH) or its affiliates.

Charts based on UnitedHealthcare paid claims data for Commercial, Medicaid, & Medicare, where applicable.

# Exhibit "J"

S--1 (11)

**ALLEN**

**DYER**

**DOPPELT**

**MILBRATH &**

GILCHRIST, P.A.

INTELLECTUAL PROPERTY ATTORNEYS

Herbert L. Allen
Ava K. Doppelt
Stephen D. Milbrath
Brian R. Gilchrist
Christopher F. Regan
David L. Sigalow
Richard K. Warther
Michael W. Taylor
John F. Woodson II
Stephen H. Luther
Jeffrey S. Boyles

Ryan T. Santurri
Robert H. Thornburg
Jack G. Abid
David S. Carus
Justin R. Sauer
Allison R. Imber
Matthew G. McKinney
Jaafar Choufani
Brock A. Hankins
Cameron C. Murphy

Registered Patent Agent
W. Grace Zhao, Ph.D.

smilbrath@addmg.com

February 23, 2017

<u>**VIA EMAIL**</u>

J. Stephen Pullum, Esq.
Pullum & Pullum, P.A.
250 International Parkway, Suite 340
Lake Mary, FL 32746
steve.pullum@pullumlaw.com

Ladd Fassett, Esq.
Fassett, Anthony & Taylor
1325 W. Colonial Dr.
Orlando, FL 32804
lfassett@fassettlaw.com

      Re:     Appraisal of Pennachio & Fishman, M.D., P.A.

Gentlemen:

      I write to renew the request of Dr. Pennachio to conduct an audit of the MD PA's practice management system. We are engaging an audit firm skilled in Medicare audits and with particular expertise in ophthalmology procedures. We propose that the audit firm be allowed access to the practice management database in order to conduct the audit. As you know, your clients have locked Dr. Pennachio out of the practice management system, even though he remains a shareholder in the MD PA.

      The audit firm will query the MD PA database for billing (excluding any HIPPA data and thus avoiding HIPPA problems) by all three of the physician shareholders concerning the codes and items for the following procedures during 2012 through 2015:

- Retinal photography
- Gonioscopy
- Ratio of complex cataract surgery to standard cataract surgery
- Ratio of YAG laser capsulotomy vs cataract surgery
- Any billing or database entries for codes or procedures related to the above and necessary for completeness.

---

**Orlando Office (Main)**
255 South Orange Ave.
Suite 1401
Orlando, FL 32801
Mail To: P.O. Box 3791
Orlando, FL 32802-3791

tel: 407-841-2330
fax: 407-841-2343

**Winter Springs Office**
1135 E. State Road 434, Suite 3001
Winter Springs, FL 32708
tel: 407-796-5051  fax: 407-796-5065

**Miami Office**
1221 Brickell Ave., Suite 2400
Miami, FL 33131
tel: 305-374-8303  fax: 305-374-8306

**Jacksonville Office\***
4720 Salisbury Road
Jacksonville, FL 32256
tel: 904-398-7000  fax: 904-398-7003

**Tampa Office\***
2202 N. West Shore Blvd., Suite 200
Tampa, FL 33607
tel: 813-639-4222  fax: 407-841-2343
*Satellite Office



www.addmg.com

J. Stephen Pullum, Esq.
Ladd Fassett, Esq.
February 23, 2017
Page 2

If you will agree to the audit, a written protocol will be prepared by the auditor outlining the audit above in more detail for your further review and approval. The audit will be paid for by Dr. Pennachio, subject to his right to seek reimbursement for the costs of the audit from Dr. Fishman and Dr. Sheridan. The results of the audit will be made available to you and will be made confidential pending a good faith effort of the parties to mediate or settle any issues arising from the audit. Should the parties be unable to agree on the implications of the audit, Dr. Pennachio will take such measures as he deems appropriate to protect his legal interests.

If you are unwilling to agree to permit Dr Pennachio to conduct this audit, even though he is a shareholder in the MD PA and is potentially derivatively liable for any reimbursements that may be due the government or other payors, Dr. Pennachio will consider his legal remedies. The practice management database is an asset of the MD PA and it has official business records of the practice, including those of Dr. Pennachio. We believe that he has the legal right to conduct this audit under Florida law. If you disagree with this view, we would appreciate your explaining your legal basis for the objection.

I should note that the billing practices of Dr. Fishman and Dr. Sheridan have been an issue in the practice since at least 2012. Dr. Pennachio has good cause for believing that the physicians of the practice may have a legal obligation to self-report to CMS under current Medicare regulations. In that connection I wish to call to your attention data concerning Dr. Fishman and Dr. Sheridan from public databases, which I attach, and which show that both physicians are among the highest billing practitioners in the State of Florida in the categories listed above for the period noted. (These records do not go back earlier than 2015 apparently). Your clients should be as concerned as Dr. Pennachio is about the implications of the data, and only an audit will provide concrete evidence on which the parties can act.

I am renewing this request now because of the many recent communications from you in which you have demanded Dr. Pennachio's evidence to support the level of billing or medical judgment errors of Dr. Fishman and Dr. Sheridan. The irony is that the evidence is in the medical practice management database, which you have locked Dr. Pennachio out of. Your clients are thus depriving him of the objective, empirical evidence necessary to expose the level of wrongdoing on which you are demanding the evidence. This is not only disingenuous but rises to the level of a breach of fiduciary duty by your clients

I urge you to reconsider the audit immediately. If I do not hear from you further on this issue I will assume that Dr. Pennachio must pursue other avenues for obtaining this essential data. Demand is also hereby made that your clients preserve all electronic data and electronically stored communications of the MD PA including but not limited to the entire medical practice management database. Should we find later that these files have been manipulated, altered, "lost", or otherwise subject to spoliation Dr. Pennachio will pursue all remedies available to him for spoliation of evidence.

Very truly yours,

Stephen D. Milbrath

Enc.